Case number 24-5201. Susan Qashu, Ph.D., also known as Pamela L. Eppalens, v. Marco Rubio. Ms. Khan, Frederick Eppalens, Mr. Walker, Freddie Eppalens. Good morning, counsel. Ms. Khan, please proceed when you're ready. Thank you, your honor. May it please the court. During her fellowship at the State Department, Dr. Susan Qashu's supervisors ridiculed her disability, berated her when she requested help with her assistive technology, diminished her responsibilities, and did not renew her fellowship. I will begin with the non-renewal of her fellowship, which a jury could find was discriminatory. State claims that it rescinded Dr. Qashu's fellowship because she did not return her renewal paperwork on time and couldn't commit to remaining in the Office of Ocean and Polar Affairs. A jury could disbelieve both explanations. Three pieces of evidence contradict State's missed deadline explanation. First, AAAS representatives in an email at JA449 provided Qashu an extension on returning her renewal paperwork while they considered her proposed changes. Second, Qashu testified at JA64 that she called each week to check in on the status of her paperwork. And third, State Fellowship Coordinator Jenya Dana informed Qashu that her proposed changes were approved at an email at JA229 without alerting her to any missed deadline or risk to her fellowship. Given this ongoing dialogue, a jury could conclude that, I'm sorry, a jury could disbelieve State's explanation that it rescinded Dr. Qashu's fellowship a few days later because she had missed the renewal deadline. Second, a jury could also disbelieve the State Department's explanation that it did not renew Dr. Qashu's fellowship because she could not commit to staying in the Office of Ocean and Polar Affairs. Dr. Qashu only sought minor proposed changes in her paperwork, which is at JA226. She simply wished to change the reference to Dave Sawyer from mentor to point of contact slash supervisor. And that change was ultimately approved in the same email at JA229. So given the fact that at that point the State Department, AAAS, and Dr. Qashu were all operating on the assumption that she was going to stay in the Office of Ocean and Polar Affairs with Dave Sawyer as her supervisor, a jury could disbelieve State's explanation that it rescinded her fellowship because she could not commit to staying in that office. So there had been some back and forth about her switching offices though, right? Yes, there was some testimony that in early June Dr. Qashu considered switching offices or supervisors. But she at that time also was willing to commit to staying in the Office of Ocean and Polar Affairs as she testified at JA64. And at that time she also tried to hand in paperwork which kept her in the Office of Ocean and Polar Affairs. Because if you look at her proposed edit to the paperwork at JA226, there's no edit to the statement that the second year of her fellowship will continue in the Office of Ocean and Polar Affairs. So when you say at JA64, that's where I look to see indication that her perspective was, yes, first best solution is I'd like to switch offices. But second best solution is renew but stay in the same office. It wasn't as if it was being framed as I'd like to renew but only if I can switch offices. Yes, exactly. And that's the State Department's whole argument that she was either wanting to change offices or supervisors or not continue her fellowship. But that's really contradicted by evidence in the record. I mean, she testified that she was willing to stay in the Office of Ocean and Polar Affairs from the beginning because she loved her ocean acidification work. And that's at JA65 where she testified that she was willing to stay in the Office of Ocean and Polar Affairs. And even one of the supervisors that she sought to change to, Julie Gorley, was also in the Office of Ocean and Polar Affairs. So there's just no evidence that she was so intent on changing offices that she would have preferred to, I guess, not to do the fellowship at all. And also by July, by the time of the July 12th email, there's clear evidence in the record that she was willing to stay in the Office of Ocean and Polar Affairs because the only change she requested was changing the reference to Dave Sawyer from mentor to supervisor slash point of contact. And in order for Dave Sawyer to have been her supervisor, she would have had to be in the Office of Ocean and Polar Affairs because that was where he was situated. Where do you think it gets you if we think that there's some doubt about those two rationales? The one being you didn't submit your paperwork in time and the other being you wanted to switch offices, but you're not going to be able to switch offices. Yes, so this court said in ACCA versus Washington Hospital Center that evidence from which a reasonable jury could conclude that an employer's proffered explanation is false can be enough to get the case to a jury because the fact that a employer hid their true explanation suggests that they have something to hide. And that's something may well be discriminatory intent. But here we also have independent evidence of discriminatory attitudes on the behalf of decision makers, on the part of decision makers. So before we go to that, I do want to hear what that is in your estimation. But before we go to that, if we just put that to the side for a second and suppose all we have is the two proffered justifications and then in your mind, neither of those holds up. Where does that leave us vis-a-vis summary judge? That alone. Yeah, so that would allow you to send the case to a jury because a jury could infer from the fact that the State Department's proffered explanation is not the real one that from that from that evidence alone that that the that there was a discriminatory motive. And because we're in a situation where the State Department has been accused of discrimination and are providing an explanation in that context as to why they took these challenge employment actions. And so if their reason for the challenge employment action is turns out to be false, I think a jury could infer from that that they, like I said, they had something to hide and that something. But a couple of times you said that we could allow it to go to a jury. But do we have to or what what factors into it apart from the independent, apart from the evidence that you think independently shows that there was a potentially discriminatory? Yes, well, so I think of this case, this court said in Jesus versus Washington Post that it's not an easy answer because in ACA versus Washington Hospital Center, the court essentially said, like, there's no concise and generic way to condense under what circumstances the evidenced calling an employer's explanation into question is enough to go to a jury. But it's but I think here what you have is both the prima facie case, which is the fact that Dr. Cashew was terminated from her is a member of a protected class and was terminated for a reason that was neither that she wasn't successful at her job because that was never in the record and not that she that that her position was eliminated, which are the two most common reasons that an employer will eliminate a position. And this court said in George versus Levitt that that's enough to show a prima facie case. So you have that evidence plus the State Department's reason being called into question by evidence in the record. So I think those two things together are enough to send this to a jury. But as I said, there's something about the shift gears a bit. Yeah, on accommodation of her handicap disability. I don't understand how we could take into consideration anything on that score that predates that predates for saying it was great. Everything was wonderful. Well, your honor, I think to wash out whatever predates that. Well, I have two responses to that, your honor. So first of all, when she said that it was everything was stupendous and fabulous. She was only referring to the accommodations that come from the disability and reasonable accommodations office, all the computer stuff, the equipment, all of that. Yes, but it doesn't have anything to do with, for instance, her move to a quieter office because her supervisors and OPA were the ones who had the purview over whether or not she could change her office. There's a lot in your brief about about equipment. Yes, there's a lot of it predates the relevant statements. Yes, and we just can't we just disregard that? I mean, I take that grant you if there's other things that poststater aren't covered because they weren't part of the equipment Brad provides. Well, no, I think the fact is that this email is not does not conclusively show that she was fully reasonably accommodated. I think the email that you're referring to is the exchange with her supervisor, Chevron Baltimore, in which Baltimore said, you know, basically where Dr. Cashew said, I'd like to have a meeting with you in the office of DRAD. Would you be willing to do that? And Baltimore said, I'm too busy to do that. So is that really essentially is that really what was the date of that September 2016, which is after this thing? Well, no, so I think this this statement is a part of an email exchange with the office of DRAD, because it's at I think it's at J. one ninety five. I'm sorry, it's so it's at J. one ninety six and it's part of the exchange that starts at J. one ninety five and it's it's dated September twenty third, twenty sixteen. And basically, you know, in the context of this email, Chevron Baltimore had asked whether, you know, there was some support that Dr. Cashew needed from the office that she's not getting. But the tone of the email was that she didn't want to like, I don't really need a meeting. She didn't really wasn't showing a lot of enthusiasm toward meeting with Dr. Cashew. And so my point with all that just is just to say that at this point in September, Dr. Cashew had been experiencing hostility for requesting reasonable accommodations for months. And so at that point, I think a jury could. I can't hear as fast as you're talking. Sorry. And so I think at that point, a jury could conclude that at least one interpretation of this evidence would be that Dr. Cashew didn't feel comfortable asking for additional accommodations at that point, given the hostility that she'd faced. And also because her supervisor's email indicated a reluctance to meet from the beginning. And so I don't think that it conclusively shows that all of her reasonable accommodations were completely adequate at that time. And on the move, the moving the office, that was about the noise. Isn't that right? Yes. So she was given the headphones early on. Yes. So long before she said everything was great. Yeah. So I think that that indicates that the headphones weren't enough to block out. What is there on the record? Yes. So a J.A. two fifths. Well, first of all, just to take a step back. So she was given the headphones from the first day of her employment, which was February 7th, 2016. And she states in her declaration at J.A. two fifty seven or J.A. two fifty five that she sought she first sought to move to a quieter office in March 2016. And so at that point, she already had the headphones since or not. Not sorry. Yeah. Sorry, I meant to say J.A. two seventy three. She states that J.A. two seventy three that she started asking Sawyer for an office accommodation in March 2016, but she'd been given the headphones on February 7th, 2016. And so she already had the headphones when she was making the statement that her office was too noisy for her to hear the assistive technology. And earlier on in that same declaration, she says that she would wear her headphones every day. And so I think that that could have visibly signaled to her supervisors that her headphones were not enough to block out the noise of the printer scanner machine and the noise of her other colleagues talking. So I think that the headphones given the really key point here is that no accommodation was given to her after she asked to move to a quieter office. The headphones were given to her before. But I think any supervisor could understand that if she's asking to move to a quieter office because she can't hear technology like that, the accommodation she already has aren't fixing that problem. And you also see that at J.A. two sixty seven, because she's stated that she has to stay until 10 p.m. at night to finish her work because she couldn't hear on another score. Failure to promote her is the way I think you put it in the brief. This isn't mentioned in the complaint. I'm only the demotion that shows up in the alleged demotion that shows up. And so the district court didn't deal with separately with failure to promote. And I'm not sure it's a promotion, right? There was no it would have been there was no change in gas level or whoever was who got the position that she would have liked. But you're saying she would have liked. Um, yes. OK, so there was nothing in the complaint about that. The district court, therefore, didn't deal with it. And when asked whether she wanted to take the lead, which is all this is about, not her position, but the portfolio, some responsibility for that portfolio, she demurred. Well, OK, so how she can say complain about not being chosen when she's expressed no interest in the position? Well, so OK, so directly ask and express no interest. And neither did both.  Neither of them did. So the supervisor, I think, was good. It wasn't that case. Evan Bloom, thank you, had to make a decision and made it. Yeah, so I have two responses. So the first response is that at JA 291, Dr. Cashew said that she met with Shepherd Voltmer, her supervisor, and Voltmer supported her continued primary role on the portfolio and said that she would run that past Evan Bloom. So I think from that, this is a dispute of fact. And then the upper level supervisor decided the other one. Yes, but I think that a jury could find it discriminatory that the reason that state or could disbelieve state's reason because it said that the reason that it didn't give her this role is because she didn't ask for it. But there's evidence in the record that she essentially did ask for it by speaking with her supervisor and asking her to check with Evan Bloom about whether she could continue in a primary role. And then my second point is that we know that Voltmer ever did that. Well, Voltmer said that she never gave any recommendation to Bloom in her affidavit about who should take on the lead. But I think that as far as Bloom knew, she expressed no interest. The intermediate supervisor had never said anything one way or the other. Well, first of all, I think so. First of all, there's a dispute of fact, because obviously, Voltmer says she never said anything to Bloom. But Cashew says Voltmer told her that she would check with Bloom. So that's a dispute. Those aren't inconsistent. She told her she would check with Bloom, but it turns out she never did. Well, yeah, I guess. But I think that it could be inferred that if she told. A lot of inferences going. Yeah, well, my other inferences. You're entitled to some inferences. I grant you, but not infinitely. Right, but I think. So what about the problem that this wasn't raised, that the failure just wasn't in the  In fact, it wasn't in the proceedings in the district court. It just goes up in your brief, different counsel, different arguments. That's not really correct, is it? Well, I think that. The definitely in the complaint at J206 at 103, and this is kind of dovetailing with my second point that regardless of whether you call this a demotion or a promotion, our key argument here is that her responsibilities change significantly. And that's it. Let's deal with that. Responsibility has changed. Why? What in the statute says a change of responsibilities is sufficient to make out a case? Well, I think that some of this. Are the responsibilities a term or condition of employment? Yes. Really? Well, I think that here. Responsibilities within a job. She did a lot of different things. Her evaluation lists about six different things that she was involved. Yes, but I think that this court or the Supreme Court said it on call that like terms and conditions aren't just reduced to what is a part of the contract. And this court said in Chekovsky versus Peters that a significant diminishment of responsibilities can be adverse to permit a claim under Title seven. And like, we're using the same standards here. And then also, we just had the Supreme Court case, Muldrow, where the key argument was a change in responsibilities because Jitanya Muldrow was moved from one role to another without being demoted. And she the key argument was that her responsibilities. You need some harm. Yes, you need some harm.  Yes. Change of responsibilities. Well, here we have. I think we do have some harm. I think it's also a material adverse action. I think a jury could find it to be a material. Really? It's even that not just.  Well, OK. So I for the stars here. Well, no, I think that at J 524, you really get a good sense of what her responsibilities were prior to the switch and Bach taking over on October 25th, 2016. And so prior to back taking over, she collaborated with interagency partners to run a conference in Helsinki on ocean acidification, provided expert technical advice on the topic, developed and reviewed calls for ocean acidification proposals, and then also spoke at interagency meetings and on behalf of the State Department. She continued to do. At least at least with her emails. Well, she's still involved. Well, well, after all. Well, so at J 257, she explains how her duties changed after the like back taking over. And she states there that she was essentially reduced to a clerical role, that she could not speak on behalf of the State Department without Beck's permission. An estimate of how much time she spent on that portfolio. Yeah, so her performance review says that she spent a considerable amount of time on it, and then at J 524. And then if you look at the narrative description of what she did during her whole fellowship, it's almost all ocean acidification work. So I think from that, you could infer that at least. 524 that I'm looking at. Engaged in a diverse range of ocean related issues over the last year. I also work to advance efforts to expand global ocean monitoring through the global ocean acidification network. Staffed and second world ocean assessment. Separate issue, separate portfolio. More broadly, made her expertise available widely within not just her office, but also the Bureau at large. Well, I think a jury could infer from this that because the first sentence is a considerable amount of her time was spent advancing department efforts to combat ocean acidification. Yes, that's a fair inference. I mean, that's on the page, but I'm not sure why that supports an action. Well, so just to go back, though, I think it's important to understand that after Beck took over, her duties changed drastically, or at least there's a dispute of fact over whether they did. So I think that this is at least a jury question as to whether her responsibilities were significantly diminished, because she says that she was reduced to a clerical role, which is different from a role in which she provides. That's what's said, but then after that, she's engaged in these emails. She clearly was doing more than just supporting. Well, those emails were, you know, even under her own explanation of how her role changed, she did say that she could communicate with Beck's permission. And so it's possible that there were a few emails that Beck permitted her to send. And one of the key emails is about the conference in Helsinki, which everyone agrees that she took the primary lead on. So it may have been like a kind of grandfathered in that she'd already worked on that conference. But generally, I think there's a dispute of fact here over whether her roles changed significantly, because she went from, as I said, running a whole conference in Helsinki and providing, you know, speaking on behalf of the State Department and interagency working group meetings, and also in staff meetings, to a role where she couldn't even speak in staff meetings on this topic at all without Beck's permission. And so I think any reason. Okay, go ahead. Well, as far as we can tell, Beck just gave her blanket permission, because there's no instance where she was, that we know of where she was muffled. Thank you. I have just one final question on going back to the disparate treatment and non-renewal. So you were going to give us a quick list of what the direct, what the evidence is, from which not just that the Crawford explanations were protectual, but that there was discrimination at work. And I'm just going to give you a chance to do that. But to focus on indicia that, in fact, indicate discrimination based on disability, as opposed to maltreatment, because the bosses were just not very charitable people. Yeah, so there are three, basically, groups of evidence that I'll highlight. First, the affidavit at JA300 from Alicia Cahoon, a reader who worked regularly with Dr. Cashew. And she declared that, based on her experience working with Dr. Cashew, that management also seemed to resent the fact that people from our office were coming to assist Dr. Cashew, and that someone had to be at the front door to let people from our office inside. The managers at DOS, which is Department of State, seemed to regard reasonable accommodation for her as an imposition. And then later on, at paragraph 8, she states that, I also noticed that other employees were frequently treated better than the employees with disabilities with whom I worked. So that's one piece of evidence. The second piece of evidence is the evidence related to Sawyer, Cashew's first supervisor, who berated her when she was using readers. And when she was trying to set up a printer to work with her assistive technology, said, don't you see that people have better things to do, which could indicate that spending time on reasonable accommodations was a low priority for the office. And then he also engaged in pelvic movements whenever she was in his presence, which he did not do to other employees without disabilities. And she testifies that at JA-71. And that appeared to be a way to exploit her limited eyesight, because I think a jury could infer that that was a way of exploiting her limited eyesight, because he assumed that she couldn't see those derogatory gestures. And then third, and- I'm not quite following that one, because it would be one thing. I don't understand why that's discrimination based on disability, even if it's true that for somebody else to do the same kind of behavior, they'd have to have their back turned. Well, I think it's because it's taking advantage of the disability and sort of amusing himself at her expense, knowing that she has limitations that sighted individuals don't have. There's also the fact that she testified that he didn't do this to non-disabled employees, which is a disparate treatment. And then also, it's sort of like if you had a deaf employee and you said things in front of them that you knew they couldn't hear, just for the purpose, basically, of exploiting their disability for your own amusement. And then our third piece of evidence is related to Bloom, Dr. Cashew's second other supervisor, higher-up supervisor, who would turn his back whenever she was in his presence, which this court has said can show discriminatory attitude in Tchaikovsky versus Peters, and then also did not respond to her complaints about the derogatory gestures of Sawyer. Let me make sure my colleagues don't have- Can you help me understand who made the decision on the renewal? There was AAAS, and then there was State Department. I take it those are two different entities. And can you help me understand that better? Yeah, so I think that they made the decision together because the State Department has admitted its involvement in this decision, at least as to the staff's office, which is like the state, the fellowship coordinating office. And then also, I guess there's a dispute of material fact over whether Sawyer and Bloom were involved in the decision. But there is evidence in the record suggesting that they were. So, for instance, AAAS, before making the decision not to renew Dr. Cashew, called Sawyer to ask for his and Bloom's point of view on this, and that's at JA-375. And then also, the AAAS 30B-6 deponent testified at JA-414 that if the host office and the fellow agree and both wish to seek a renewal, that AAAS wouldn't upset that decision. So that suggests that the State Department was involved. Thank you. And there's also, I guess, one of the letters at least speaks in terms of a three-way agreement. And, I mean, there's obviously a question that later emerges about whether Cashew, in fact, was on board. But the other two legs are AAAS and State. Yes, yes, that's right. And that letter at JA-452 also references discussions with the host office as producing the decision not to renew. We'll give you a little bit of time for rebuttal. Thank you, Counsel. Good morning. May it please the Court, Johnny Walker for the Secretary of State. Your Honors, the Department of State welcomes disabled employees and expends significant resources to ensure that there is success at the agency. For Dr. Cashew, the Department did that. On day one, when she began her one-year fellowship in 2016, it had acquired for her nearly a dozen different technologies and tools to accommodate her central vision loss. It provided her a desktop computer loaded with a software that can both read text out loud and zoom into the text, separate software that could also read out loud text, a laptop computer with both of those same softwares loaded onto it, an extra-large monitor with an arm that she could use to extend it towards her face, a closed-circuit television that she could use on her desk that she could put hard-copy documents on, which would both magnify those documents and read them out loud to her. It also gave her a handheld device that she could take around the office to magnify things like displays on shared office equipment and door numbers, as well as change the contrasts of those so that she could see them more clearly magnified. So most of this goes to the accommodation part of the case, and I know that that's been a meaty part of the briefing, but if you could start with where the other side started, which is on disparate treatment and the non-renewal. So as I read the ultimate decisional document, which is at JA-231, the first consideration mentioned is that there was a deadline to submit signed renewal paperwork passed more than a month ago. And then the next one is that your request to change offices and mentors is not approved. There's some stuff in the middle about fit and things like that. It doesn't sound like there's a whole bunch of reliance on that from your perspective, understandably, because that could just dovetail with the office switch. But it sounds like that's what you think. But in terms of the signed paperwork being more than a month ago, which is the first thing that's stated, it's just she did try to sign it. The record shows that she signed it and had it in her possession to turn in, but I think the key is that she consistently indicated her unwillingness to rejoin the office where her fellowship had been renewed and to be supervised by the deputy director of that  And what you see consistently in the communication—  This is Sohir. But I thought what she was trying to clarify is that he was her supervisor. No, I mean, she says in her deposition that she wanted to change supervisors and she wanted to change offices. And she was continuously raising these concerns with the central office at the Department of State that makes these decisions. Did she not say, I'd like the letter changed so that it reflects that Sohir is my supervisor, not my mentor? She did say that. And eventually, Ms. Dana reached out to her and said, I want to understand your concerns with renewing with the Office of Ocean and Polar Affairs. Ms. Cashew took over a month to get back to her and eventually did. And then Ms. Dana responded that they would change Mr. Sohir from her supervisor to her point of contact. I'm sorry, instead of mentor, they would call him a point of contact. And Ms. Cashew, again, all this time, she's raising additional concerns about renewing with that office at all, saying that she didn't feel she was a good fit in that office and that she didn't want to be supervised by the person who is the deputy director of that office and is responsible in part for running the office. And so after Ms. Cashew doesn't respond to Ms. Dana's email, changing the designation of Mr. Sohir for over a week, AAS sends her that letter saying that her fellowship is not being renewed, that her request to change offices was being denied. So this entire explanation in your mind then turns on the notion that there's no reasonable dispute of fact on whether she would only accept renewal if her office was switched. I think that I don't know that we can get quite that far on the record, that she was firm that she would absolutely not. What she was definitely doing was raising concerns about the office that she had been renewed with that made the central office at state, Ms. Dana, unwilling to process her renewal and accept her and renew it. There seems to have been a mutual concern about her fit in the only office that the Department of, I shouldn't say a mutual concern. There's a concern being raised by Cashew, which causes a concern on the part of the Department of State about Ms. Cashew being able to fit with the office, the only office in which she is being offered a spot. So I think that, you know, the explanation here is broadly consistent. She's definitely raising those concerns. There's no dispute about that in the evidence. And the Department of State is not going to, is not renewing her position in the Office of Polar Affairs because she consistently expresses those concerns and does not retract them and explicitly accept the position of the office. So your view, I guess, is that she had expressed concerns about her current station. She might not have conditioned her renewal on switching station, but from state's perspective, she was concerned enough about her current station that she wasn't, that indicated a lack of sufficient commitment to the current station. And so then state thought, OK, look, you've said you're willing to sign. That's undisputed. This can't be about paperwork of signing. That just seems like that's not possible. But what it indicated was you're not really that happy with where you are. And if you're not really that happy with where you are, then it's the fit just isn't good enough. And so we're not going to renew. That's kind of the way that you. I think that's the way I put it. I don't think we see her explicit. Ms. Cascio, I don't think we see her explicitly conditioning on that, but she's certainly giving that impression with the concerns that she is raising. I see. And you think there's no, that's sufficient. There's enough of a clear indication of that in the evidentiary record that a jury couldn't conclude otherwise in terms of whether that's the real reason. Well, I want to back up a little bit. I'm just talking about the fact that I think the record is quite consistent, even if you could draw the types of inconsistencies that my friend is drawing, they don't go so far as to demonstrate discrimination, right? This court's case law is clear that it's not enough to show the employer's reason to be pretext. And as I say, I don't think there's any indication of pretext here. It also has to show that the real reason is discrimination. I don't think that's true. It's not a judgment. I think, I think what Aka says is that there are times when the employer's explanation explanation is so false and so disbelievable that it gives rise to a discriminatory motive, that this is far from that circumstance. And I think this court has said that's the government's view is that the, if, if, if the employer puts forth the government for one explanation and that explanation is disproved, it has to be so false that it could be discrimination. If there's the only explanation that's given, if you're in the case, I think I read Aka as saying it does have to be, there are circumstances when the explanation is so false that it gives rise to an indication of discrimination. And then the pretext cases say that an employer must show that the employer's reason is pretext and that the real reason is discrimination. But I think, as I say, I think here, it doesn't come close to such falsity that, that, that So what my friend does is try to rely on other indications of discrimination that she went through. Most of those relate to actions by Mr. So here and Mr. Bloom, the director and deputy director of the office of ocean and polar affairs. And, but the reason that those don't work here is because they both supported renewal of Ms. Cashew's fellowship consistently. And she indicates that, I mean, my friend indicates that there was a call between the central office that say, I think it's the office of the science and technology advisor to Mr. So here, but what, what Mr. So here testifies that call consisted of is that office asking if Mr. So here would be okay. If that office decides not to renew Ms. Cashew's fellowship. So there's no indication of a cat's paw where Mr. So here, while indicating that he supports the renewal somehow influences the central office to not renew it. It's quite the opposite. They check in with So here and say, we know that you support the renewal of the fellowship, but we want to withdraw it. Would that be okay with you? Um, you, she, she took them. If I understand, right. She took a month to reply to an email, correct. Do you think that why isn't that alone? A fireable offense, or at least a reason enough not to renew someone's fellowship. Yeah, I think it is. It is a building block in this picture. You have of the state department. It had renewed Ms. Cashew's fellowship. Let's be recalled. It, it renewed it. It sent her a letter saying you congratulations, Dr. Cashew, your fellowship has been renewed with the office of polar affairs, simply accept it. And what you have is a consistent string of events after that of her indicating that she did not want to work in that office indicating that she did not want to work in that with that supervisor and taking over long to respond to emails and communications when she had been given a deadline. Now, she argues that that her deadline had been extended indefinitely, but that's not what the email records show. I mean, she said that I'm going to be on vacation next week. And she's told we can certainly take up this issue next week when you return, but she's never told you can turn in this paperwork whenever you want indefinitely into the future. Do you agree with this? A reasonable jury could only conclude that after someone is given a week-long extension of a deadline, misses that deadline and blows past it by an entire extra month, that the employer has a non-discriminatory reason to fire them. Yes, absolutely. And it's not a, it's not a termination here, right? It's nothing so dramatic. Do not renew their fellowship. Yes, I would agree with that. I agree, particularly when you look at it in the broader picture of the concern she's raising. It's even more, it's even more or less. The letter saying congratulations also said you have a week to return this. And that extends it that at least for the week she would be away. That's correct. Nobody ever says she has an indefinite forever extension. So where would you, where do you see the stated reason being that you took too long to respond? What, where's that, where's the indication that the reason she didn't get the renewal is because she took too long to respond? Is that coming from the fact that the letter says the deadline passed more than a month ago? The, the reason is it's in the, I believe it's a June 19th letter from the director at AAAS that indicates that she, she did not accept replacement within the office of polar affairs in a timely manner. Um, and it also mentions that there's not a good fit and, um, that her request to change offices. So it's that letter. It's the, then that has to be from the line that says it passed more than a month ago. Right. Yeah. Even though it's clear that it's clear that they didn't care that she didn't respond more than a month ago. I perhaps not independently, but it's all mentioned in this letter as part of a broader reason. You did not timely accept the offer that we provided you. You're consistently raising concerns about renewing with the office. The only office that you've been permitted to renew in and working with that supervisor. So I think that this all fits within the same narrative and there's nothing contradictory about the time that she takes to sign the paper. Yeah, maybe I'm a little confused on what was going on in the month. Was it kind of constant back and forth between her and the people who were deciding what the next year's fellowship would look like? Or was there a period of several weeks up to even a month where they just didn't hear? It, the record looks, makes it look like there was a period where they did not hear from her for a month. She, at least she didn't, she ghosted at least she didn't gave no indications that she wanted to accept with the office of polar affairs. I mean, she testifies, I think in her deposition that at some unspecified time she was, she was calling and leaving messages with them. Um, but she also testifies that she was inquiring about her request to change offices. Is there someone who either emailed her or left her a message that she didn't reply to for about a month? There's no indication of that. I mean, except for the email that we have in the record that she did not from Miss Dana that she did not respond to in a month. And was there any indication when she did indicate at one point, I'm happy to come in and sign, right? Yes, but not, not to renew with the office of polar affairs. She's still during that period, raising concerns about the office to which she has been assigned. Did she say that in that part where she said, I'm happy to come in and sign? Did she say, if it's with a different office, we don't, or was that, which is an obstacle to that? She, but we, we know at that time that she is still raising concerns about working in that, that office. So she did say she's willing to come in and sign, but like afterwards, we still have communications with her where Miss Dana is trying to address her concern about renewing with the office of polar affairs. No, I understand that. But I'm just saying in the part where she says, I'm happy to come in to sign, if the timing is going to be an issue, I'm happy to come in and sign. Is there something in that communication that indicated a condition on her part that of course that means I've raised some concerns about the office. And what I mean by that is I'll come in and sign. I mean, obviously if you switch offices, is there, I'm not saying that you have to have that. I'm just wondering whether that is the way that you think we should infer that, or is it different from that? I'm not trying to say what you need to, to establish to prevail, getting an affirmative. I'm just wondering how you think we should understand that communication. I think you have to understand it in the whole context. And you have the next month in July, this is that whole context, meaning you, the way you understand that is I'm happy to come in and sign. But of course, I've been raising questions about an office switch. So what I mean by that is I'm happy to come in and sign, you know, if you switch offices, like I've been asking. Right. I mean, because those, those concerns are still being voiced and she's still voicing them on July 7th at JA 229. She's still saying, I will not sign off on paperwork that lifts Dave Sohere as my mentor. He is not my mentor. And then she says, and then Ms. Dana responds to that. That's July 7th. Ms. Dana responds July 12th, that that change will be made. And she never responds. So on July 19th, she gets the letter from AAS saying, look, your request to change offices and supervisors is not approved. And we're not withdrawing the renewal offer. Any further questions? Is there, I guess, from the State Department's perspective and for the purposes of the forum, what's the difference between a mentor and a supervisor? I recognize not all supervisors are good mentors, but it seems like mentoring is usually part of the job description for a supervisor. It is. It seems to have been a term of art that was used in connection with this fellowship. So I think most fellows would be assigned a mentor and that mentor was typically designated by the Department of State, by the host agency.  Thank you, counsel. Thank you. Please affirm. We'll give you two minutes for rebuttal. Thank you. I'd like to begin with JA-449, which is the email where Dr. Cashew said that she would come in to sign the paperwork. So on June 7th, 2016, Dr. Cashew wrote the following email. She said she renewed her membership, et cetera, et cetera. Then she said, Dave Sawyer is the supervisor, comma, boss. Dave Hogan is the mentor. Not sure which one you need to list at this point. If you need any paperwork signed by tomorrow, since I did not receive it via email, I could come by the AAAS office and try and sign it. And so from this email, I think a jury could conclude that she was willing to submit signed paperwork, keeping her in the Office of Ocean and Polar Affairs because, as I said before, for Dave Sawyer to be her supervisor, she would need to be in the Office of Ocean and Polar Affairs because that is where he is situated. And then also, Judge Walker, to your question about the difference between a mentor and a supervisor, the AAAS deponent testified at JA-408 that a mentor is not the same thing as a supervisor. And like a mentor is someone who is at JA-408 at the bottom of the page. The mentor is someone who's going to be providing some general guidance, answer questions, give input. Sometimes mentors and fellowship host office supervisors are the same person. That's not always the case. And so here, I think what we can take from the combination of these two emails is that she was willing to commit to Dave Sawyer being her supervisor and her staying in the Office of Ocean and Polar Affairs as early as June 7th. And then meanwhile, in the interim period... Yes, but not mentor. That's the point. Yeah. And then the other point is that she testified at JA-64 that she was calling every single week to check in on the status of her paperwork. So from that perspective, even though she hadn't responded to the email, I think a reasonable person could... So yes, this is at JA-64, and it's near the top of the page. She says, so I was reaching out every week or so. And so from that, even though she didn't respond by email, a jury could infer that she was following up through other mediums of communication. And the last point I'll make is that the July 12th email, once again, does not suggest in any way that she's missed any renewal deadline or that there's any risk to her  It just says that her change to change the reference to Dave Sawyer from mentor to supervisor is approved. So at that point, everyone agreed that she could continue in the Office of Ocean and Polar Affairs with Dave Sawyer as her supervisor, which is what she's been asking for from the beginning. What's your response to the notion that, look, it's not that there was some formal idea that you had to sign by a particular date and you let that date slip. It's that we sent you a letter that gave you an opportunity to sign off on renewal. You've raised some concerns. There's concerns that you've raised for some time about not being happy with where you are and wishing that you could switch to a different office. We sent you a letter. Really, I mean, you've raised a couple of things and we've tried to address those, but there hasn't been a great deal of responsiveness on your part. As a general matter, it just seems like you're not happy enough to be where you are that we're willing to go forward with the renewal because we'd like to have a situation in which there's a commitment to the task at hand. And that's the best way to read the July 19 letter is that, yes, you missed the deadline. But what we mean by you missed the deadline is that you missed the deadline, you got past the deadline, you raised some complaints as to why you didn't sign. There's still some lingering stuff about how you're not particularly happy. At this point, it's just you didn't sign off with the requisite enthusiasm and timeliness that it makes sense to go forward with this. The fit's just not quite right. Well, I think that, I guess that could be one inference of the evidence, but it's not the only inference of the evidence that you could draw from the evidence because there's other evidence in the record that I just said that she was enthusiastically trying to stay in the Office of Ocean and Polar Affairs as early as June. She tried to submit the paperwork at a June 3rd meeting. She again, as I said, emailed on June 7th, trying to submit her paperwork to stay in the Office of Ocean and Polar Affairs. She again, followed up on July. She called every week and then on July 7th, again, explained that she just wanted to make this one clerical change from mentor to supervisor. And then again, on July 12th, the State Department responded, that's fine. No problem. We can go ahead. So I do think that if the State Department this whole time was actually getting more and more frustrated with her about the fact that she was taking too long to respond or any other of those kinds of concerns, that some of it you would expect to see in their email on July 12th. But there's nothing like that. It just says, please confirm you are on board with this approach. So certainly, I suppose a jury could draw that inference, but it's not the only inference you can draw from that. What did she do after July 12th? She responded on July 20th. That sounds great. But by then, they'd already sent her the email on July 19th, rescinding her fellowship. So they didn't give her, they didn't follow up. They didn't say like, first of all, when she sent the email on July 12th, they didn't say respond within a week or give her any deadline by which to respond to confirming that she was on board with that approach. So she responded approximately a week later, saying that sounds great. But by then, they'd already rescinded her fellowship without alerting her that she had to respond. July 19th, communication from State. You referred to it as an email. Is it clear that it was not a letter? There are references to it as a letter, I believe. Yeah. So it's a letter that I think was sent by email. But yeah, it's at J. It seems odd that the next day, apparently, she hadn't seen it. She says, that sounds great. Well, she whatever it was saying. Well, she says, yeah, but she says that, like, that sounds great. But that AAA, basically, she says, like, that sounds great. But AAAS maybe has changed his mind or something. So, so where is that? Is July 20th? Sorry. Oh, I see. It's on J. June 29th. Oh, yes. This sounds great. But it sounds like AAAS has made their own decision about wording. That's about wording. So it betrays no awareness of having been told that the job was off. Yes, I think at that point, she hadn't yet received the email. What email address was it sent to? Yes. Was it sent to the same email address she used to send the July 20th email? I'm not sure. I don't know. Do we even have indications that it was emailed? The letter was emailed? Maybe there is. Everything's emailed nowadays, but I just don't know. Yeah. But it's not immediately available. That's okay. Just one final, just to put a final ball on this one. She says in the July 20th emails, it sounds like AAAS has made their own decision about the wording. What's that a reference to? Do you know? I don't think the record really reflects that, but it suggests that she may have received the email. I thought it was using point of contact instead of, so here, instead of men's. Well, I think it's not clear because at that point, she wanted Sawyer to be referred to as her point of contact slash supervisor. And Dana had responded that that was acceptable. And so then for her to say that the wording isn't. It would be strange if she was referring to the July 19th letter by saying, it sounds like AAAS has made their own decision about the wording because the July 19th letter doesn't have anything to do with the wording. It just has to do with non-renewal. Yeah. So it's just odd if AAAS has made their own decision about the wording. It's meant to be a reference to the letter that was sent the previous day, which she may or may not have received by the time she said that. So that's great. Yes. Yes. I'm not sure what the best inference to that. I'm trying to think through what a reasonable jury should be expected to do with this chronology. Let's say that a reasonable jury would think that Dr. Cashew was faultless from, I think, June 6th, somewhere around there where the offer for a renewal was first made through July 12th when this email says, basically, we've decided to give you what you want. Please confirm that you are on board with this approach, and I will let AAAS know. And then she goes a week without confirming that she is on board. I mean, if you were offered a job or your current job, hypothetically, a clerkship, even if the judge was very forgiving, if you were offered the job having been given the conditions you wanted, and he or she said, let me know, and you took a week, you ghosted him for a week, it seems like a desirable offense or a reason not to continue to offer the job to you, right? Well, I think that here, I mean, in the context of this email, Jenny and Dana herself had taken nearly a week, five days to respond to Dr. Cashew's email. She took until July 12th to a July 7th email. And so in the context of that type of communication, I'm not sure that a reasonable jury would necessarily conclude that Dr. Cashew's waiting of about a week was unreasonable, especially because Dana did not give her a specific deadline by which to reply. Thank you. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Walker; Ginsburg